(Decided 5th October, 1893.)

WILLIAM J. WORMAN, and others *vs.* JOHN C. HAGAN, and others, Board of Supervisors of Election for Frederick County.

*Amendment of Constitution—Proclamation by the Governor—Validity.*

The fourteenth Article of the Constitution declares that "the General Assembly may propose amendments to this Constitution; provided that each amendment shall be embraced in a separate bill, embodying the Article or section as the same will stand when amended and passed by three-fifths of all the members elected to each of the two Houses, by yeas and nays, to be entered on the journals with the proposed amendment." HELD:

That under this Article an Act of Assembly proposing a constitutional amendment need not be set out *verbatim* on the journals of the two Houses, where each house had the bill in its possession when it was passed, and it was fully and clearly identified by its title.

Under the fourteenth Article of the Constitution requiring the votes cast for or against a proposed amendment, to be returned to the Governor, and if it shall appear to him that a majority of the votes were cast in favor thereof, making it his duty by proclamation to declare said amendment to have been adopted, the action of the Governor in this respect is conclusive, and the amendment becomes *eo instanti* a part of the Constitution; and no other officer, nor any other department of the Government, can revise his decision.

The amendment to section 1 of Article 7 of the Constitution submitted to the popular vote, in November, 1891, providing for

the election of County Commissioners on a certain day in the month of November, "commencing in the year 1891," and that their number in each county, their compensation, powers, duties, and term of office shall be such as prescribed by law, must be construed as applicable to the commissioners elected in November, 1891, though the amendment was not proclaimed to be a part of the Constitution until December of the same year.

APPEAL from the Circuit Court for Frederick County.

A petition was filed in this case by the appellants for a *mandamus* to compel the appellees, as Supervisors of Election for Frederick County, to hold a meeting at such time as the Court might designate, and place upon the official ballots to be used at the ensuing election in November, 1893, the names of the petitioners as candidates for County Commissioners of Frederick County. After answers, the Circuit Court (LYNCH, J.,) passed a *pro forma* order refusing the writ of *mandamus* and dismissing the petition. From this order the present appeal was taken.

Section 1 of Article 7 of the Constitution of 1867, provided as follows: "County Commissioners shall be elected on general ticket of each county, by the qualified voters of the several counties of this State, on the Tuesday next after the first Monday in the month of November, eighteen hundred and sixty-seven, and on the same day in every second year thereafter. Their number in each county, their compensation, powers and duties shall be such as are now or may be hereafter prescribed by law."

The case is further stated in the opinion of this Court.

The cause was argued before ROBINSON, C. J., BRYAN, FOWLER, McSHERRY, and BRISCOE, J.

*Hammond Urner, William H. Hinks,* and *William P. Maulsby, Jr.,* (with whom was *John C. Motter,* on the brief,) for the appellants.

It is expressly stipulated, among other things, that the amendment which is sought to be proposed by the General Assembly shall be entered on the journals. This is one of the essential requisites to the proposal of an amendment; and yet it has been utterly ignored by the body which alone can initiate alterations in the organic law. This omission on the part of the Legislature, as shown by the journals themselves, vitiated at the outset the attempted amendment of the Constitution. The fact that the legislative enactment proposing the amendment bears all the external evidences of legality does not remedy its inherent defect. The Courts are the guardians of the Constitution. Their highest duty is to preserve the integrity of the fundamental law which has been ordained under the most solemn forms by the people themselves. In the performance of this duty, when the occasion arises, the Courts will look behind the printed statute to ascertain whether, in its enactment, every constitutional requirement has been observed.

The constitutional provision that the proposed amendment shall be entered upon the journals is in the highest degree mandatory. All constitutional provisions are imperative. *Cooley's Cons. Lim.*, 88, 98, 169, 180; *People vs. Lawrence,* 36 *Barb.*, 177.

This is especially so when the provisions relate to the manner in which laws may be enacted. *Baltimore and Drum Point R. R. vs. Pumphrey,* 74 *Md.*, 112; *Spangler vs. Jacoby,* 14 *Ill.*, 297; *People vs. Mahaney,* 13 *Mich.*, 481; *People vs. Commissioners of Highways, &c.,* 54 *N. Y.*, 276; *Cooley's Cons. Lim.*, 164; *Berry vs. Baltimore and Drum Point R. R.,* 41 *Md.*, 462; *Legg vs. Mayor, &c., of Annapolis,* 42 *Md.*, 203.

Each and all of the provisions of the Constitution prescribing the manner in which an amendment of that instrument may be made, without a convention of the people, are mandatory not directory, and a failure to

comply with any of the requirements thereof makes the attempt nugatory and void. *Cooley Con. Lim.*, 40; *State vs. Swift*, 69 *Ind.*, 518; *Hunt vs. State*, 22 *Texas Appeals*, 396; *Supervisors vs. Heenan*, 2 *Minn.*, 336; *Sutherland on Statutory Con.*, secs. 41, 45; *Collier vs. Frierson*, 24 *Ala.*, 100; *Koehler & Lange vs. Hill*, 60 *Iowa*, 543; *Opinion of the Justices*, 6 *Cushing*, 573; *State vs. Timme*, 54 *Wis.*, 318.

In this case the constitutional requirement is made in the form of a proviso, and thus has peculiar force as a mandatory provision. A proviso is a negation of authority beyond its prescribed limits. *Sedgwick on Con. and Stat. Law*, 46; *Commissioners of Kensington vs. Keith*, 2 *Pa. St.*, 218; *Voorhees vs. The Bank of the United States*, 10 *Peters*, 473; *Bloodgood vs. Mohawk, &c., R. R.*, 18 *Wend.*, 9.

The Court will take judicial notice of the journals of the Legislative Houses; and if it should appear from these records that any Act did not receive the requisite majority, or that in respect to it the Legislature did not follow any requirement of the Constitution, or that in any other respect the Act was not constitutionally adopted, the Courts may act upon this evidence and adjudge the statute void. *Cooley's Con. Lim.*, 163; *Berry vs. Balt. and Drum Point R. R.*, 41 *Md.*, 462; *Legg vs. Mayor, &c., of Annapolis*, 42 *Md.*, 203; *Spangler vs. Jacoby*, 14 *Ill.*, 297; *People vs. Mahaney*, 13 *Mich.*, 481; *People vs. Commissioners of Highways, &c.*, 54 *N. Y.*, 276; *Sedgwick on Con. and Stat. Law*, 55; *Purdy vs. The People*, 4 *Hill*, 384; *Moody vs. State*, 48 *Ala.*, 115; *Supervisors vs. Heenan*, 2 *Minn.*, 336; *Gardner vs. The Collector*, 6 *Wall.*, 499.

It is the right, and consequently the duty, of the judicial tribunals to determine whether the legislative enactment drawn in question in a suit pending before them, is repugnant to the Constitution of the United States,

or of the State, and if so found, to declare it inoperative and void. *Cooley's Cons. Lim.*, 193; *Norris vs. Trustees, &c.*, 7 *G. & J.*, 7; *Holden vs. James*, 11 *Mass.*, 396; *Story on Cons.*, 377, 396; *Baltimore and Drum Point R. R. vs. Pumphrey*, 74 *Md.*, 113.

The constitutional and statutory provisions make it an essential condition to the valid submission to the people of the proposed amendment that it shall be printed upon the ballots.

This was in fact the only practicable mode of submission. The Act proposing the amendment only required that the ballots should contain the words, "for the constitutional amendment," or "against the constitutional amendment," as the voter may elect, evidently contemplating that there would be only one proposed amendment to be voted upon. There were, however, five other similar bills passed at the same session of the Legislature, each providing that the amendment proposed should be submitted as just stated. If the mode of statement thus prescribed had been necessary to be followed, there would have been no means of distinguishing the various proposed amendments as presented upon the ballots. But the General Election Law of 1890, passed at the same session, but subsequent to the six bills proposing amendments, made ample provisions for the emergency then present and apparent by prescribing for the separate submission, in print, of "each submitted amendment, or question." This law was, therefore, of necessity the controlling legislation on the subject, by reason of the utter impracticability of the mode of submission provided in the various Acts proposing the amendments.

The form of submission employed was altogether defective, even aside from the constitutional and statutory requirements governing the mode of statement. It is absolutely necessary that the voters of the State should have revealed to them at least the true purpose and

meaning of the proposition submitted for their approval or rejection, before they can exercise in reference to it an intelligent judgment. The question, as stated on the ballot, bore no indication whatever of the real nature of the proposed amendment. The question as submitted in the official ballot was, therefore, not only insufficient in contemplation of law, but was also false and misleading. It was not the proposition which the Legislature intended to be submitted to the people, and the true question not having been stated and voted upon in the prescribed mode, cannot have been adopted and become incorporated into the Constitution.

The Constitution having provided that the proposed amendment should be submitted to the people in a form to be prescribed by the General Assembly it is absolutely necessary that every detail of the form prescribed should be strictly complied with before any change in the original law can possibly be effected. *Cooley's Const. Lim.*, 40; *Opinion of the Judges*, 6 *Cush.*, 573; *Collier vs. Frierson*, 24 *Ala.*, 100; *Koehler vs. Hill*, 60 *Iowa*, 543.

Assuming that all of the requirements had been complied with in the proposal, submission and adoption of the amendment in question, and that it had become a part of the Constitution of the State, it could not have become such until the Governor's proclamation was issued declaring it such, which proclamation was not issued until the 3rd day of December, 1891. It is a well established rule of construction that whenever a statute prescribes the time when it shall take effect every provision and clause of the Act, whether it be for making any new law, or for repealing, qualifying or amending any old one, is absolutely suspended until the time limited for it to take effect arrives; to the same effect and purpose, as if it had been passed on that day. And the same rule applies with equal or greater force in regard to constitutional amendments. The instrument

prescribes and limits the time when they shall become part of the Constitution. *Opinion of the Judges*, 3 *Gray,* (*Mass.,*) 605, 607; *Rice vs. Ruddiman*, 10 *Mich.*, 126; *State vs. Timme*, 54 *Wis.*, 318.

The declaration contained in the proposed amendment that: "County Commissioners shall be elected, &c., on the Tuesday next after the first Monday in November, commencing in the year 1891," was impotent to affect their election; they would have been elected just the same had the proposed amendment failed to receive a majority of the votes cast upon it in its favor. It is impossible to command in the present a thing to be done in a time that has passed. *Groome vs. Gwinn*, 43 *Md.*, 631.

It is utterly incompetent for the Legislature by its act alone to amend the Constitution of the State. That instrument can only be altered or amended in two ways; either by a convention emanating from the people or in the mode prescribed by the instrument itself. Any other method would be revolutionary. When the Legislature therefore undertook to enact in regard to the proposed amendment that if adopted by the legal and qualified voters of this State it "shall supersede and stand in the place and instead of section one of Article seven of the said Constitution," it was attempting to transcend its powers by violating the limitations imposed upon it, and the mode prescribed for its amendment by the Constitution they were sworn to support. For if the amendment were adopted, it could only have such force and effect as its own language would import into the Constitution and necessarily constrain, for the proposed amendment contains no express repeal of preexisting provisions of the Constitution. It can therefore only repeal so much as is requisite by necessary implication. The amendment must speak for itself, the legislation cannot add to nor take from it anything. So far as

the provisions of the amendment are inconsistent with the previous provisions of the Constitution they vacate and annul the former, but in all other respects the former provisions remain in force, and in so far as the proposed amendment may have been defective for want of mention of the act of the Constitution in its submission to the voters it was equally incompetent for the Legislature to supply that defect by its act alone. *Opinion of the Judges*, 3 *Gray*, 602; *State vs. Macon Co. Court*, 41 *Mo.*, 458; *State vs. Timme*, 54 *Wis.*, 318.

It cannot be successfully contended that the words "commencing in the year 1891," were intended to have any retroactive force or significance, or if so intended, that the Court will so construe them.     Retroactive enactments unless appearing to serve some beneficent purpose are received unfavorably by the Courts, and the language of the Act must bear unmistakable evidence of its intention to act retrospectively or the Courts will not so construe them. *Story on Constitution, sec.* 400; *Groome vs. Gwinn*, 43 *Md.*, 631.

It is an inflexible rule that a statute will be construed as prospective and operating *in futuro* only unless the intention of the Legislature to give it a retroactive effect is expressed in language too clear and explicit to admit of a reasonable doubt.     Constitutional provisions especially are to be construed as operating prospectively. *Cooley's Const. Lim.*, 76 *and* 370; *City of Chicago vs. Rumsey*, 87 *Ills.*, 348; *State vs. Macon Co. Court*, 41 *Mo.*, 453; *Clark vs. Mayor, &c. of Baltimore*, 29 *Md.*, 277; *Williams vs. Johnson*, 30 *Md.*, 500.

The Act of 1892, ch. 283, attempted to extend the time for which County Commissioners of Frederick County elected in 1891 should hold their offices to *six years instead of two years*, for which they were elected.  This it was utterly incompetent for the Legislature to do, even had the proposed amendment been regularly adopted. *People vs. Bull*, 46 *N. Y.*, 57; *Page vs. Allen*, 58 *Pa.*

*St.*, 358; *People vs. McKinney*, 52 *N. Y.*, 378; *State vs. Jarrett and Harwood*, 17 *Md.*, 309.

When the Constitution prescribes the mode by which officers shall be created—the Legislature cannot prescribe another method. The Constitution most emphatically declares that County Commissioners shall be elected by the people, and the Legislature cannot change it by appointing these officers. It might as well assume to extend the term of its own members. *Declaration of Rights, Articles* 4, 34 *and* 44; *Constitution, Art.* 7, *sec.* 1, *Art.* 3, *sec.* 33.

*J. Roger McSherry, C. V. S. Levy, J. E. R. Wood*, and *John Prentiss Poe, Attorney-General*, for the appellees.

The amendment to the Constitution was lawfully submitted to the qualified voters of the State in the manner required by the Constitution and by law. It was to increase the term of the County Commissioners and nothing else. This was printed on the official ballots, and reference made therein to the Governor's proclamation duly published as required by law, as Amendment No. 4, in said published proclamation. Neither the Constitution nor the Act of Assembly requires that the amendment should be printed in full on the ballot, nor has such been the practice in this State. *Constitution, Art.* 14; *Act of* 1890, *ch.* 255; *Act of* 1890, *ch.* 538.

The amendment having been adopted by a majority of the qualified voters voting upon the same, became a part of the Constitution of the State, and was so proclaimed by the Governor as required by the Constitution, and repealed, superseded and took the place and stead of section 1 of Article 7 of the Constitution, as it existed prior to the amendment.

The Act of 1892 is, entirely constitutional and directly authorized by the Constitution as amended; but even if

the Act of 1892 be a nullity in so far as it fixes the term of office of the County Commissioners elected in 1891, then there is no law directing an election to be held. Then the Legislature has failed to pass a law designating the time of election, and there is no law on the subject, and the Courts have no means and no power to avoid the effects of non-action by the Legislature. *Myers vs. English,* 9 *Cal.,* 341.

There will be no *interregunum* permitted, and the present County Commissioners will hold over until their successors are elected and qualified. *Thomas vs. Owens,* 4 *Md.,* 189; *Sappington's Adm'r vs. Scott,* 14 *Md.,* 40; *Robb vs. Carter,* 65 *Md.,* 321.

Retroactive laws are not forbidden by the Constitution of the United States or of Maryland, and even in States where retroactive Acts are prohibited, this does not apply to constitutional provisions or amendments adopted by the people themselves. There is a broad distinction between retroactive laws and *ex post facto* laws. The one is prohibited by the Constitution, the other is not. *Drehman vs. Stifel,* 41 *Mo.,* 184; *Baugher vs. Nelson,* 9 *Gill,* 305; *Mayor, &c. vs. Sehner,* 37 *Md.,* 198; *Anderson vs. Baker,* 23 *Md.,* 565, 624; *O'Brian vs. Co. Comm's,* 51 *Md.,* 15.

Certain it is, that no law and no constitutional provision now in force, can be found authorizing an election for County Commissioners in 1893; that the amendment was designated to apply to the Commissioners elected in 1891, very clearly appears from the first clause, which provides for their election "commencing in the year eighteen hundred and ninety-one," which shows that the law the Legislature was required to pass was not to be prospective and relate only to Commissioners thereafter to be elected.

BRYAN, J., delivered the opinion of the Court.

The counsel on both sides requested that the Court would hear this cause in advance of the time when it would have been reached in the regular course of the docket. The great public interests involved in a prompt decision of the questions presented by the record required that we should accede to the request. We will explain the manner in which the case arises. The appellants having been nominated by the Convention of the Republican Party in Frederick County as candidates for County Commissioners in said county, desired that their names should be placed on the official ballot to be prepared by the Supervisors of Election. The appellees were the Supervisors for Frederick County. Passing by some matters not material to be mentioned, we may state that the candidates filed in the Circuit Court for Frederick County a petition for a *mandamus* requiring the Supervisors to place their names on the official ballot. After answers the Court passed a *pro forma order* dismissing the petition.

The Act of 1892, chapter 283, relating to Frederick County provided as follows: "There shall be five County Commissioners of said county, and those who were elected at the general election in November, A. D., 1891, shall hold their office for six years from the time of their said election, and the term for which County Commissioners of said county shall hereafter be elected shall be for six years." This Act was passed on the assumption that the amendment to section first of Article seven submitted to the popular vote in November, 1891, is legally a part of the Constitution of the State. That amendment is in these words: "County Commissioners shall be elected on general ticket of each county by the qualified voters of the several counties of the State, on the Tuesday next after the first Monday in the month of November, commencing in the year eighteen hundred and ninety-one; their number in each county, their

compensation, powers and duties shall be such as now or may be hereafter prescribed; they shall be elected at such times, in such numbers and for such periods, not exceeding six years, as may be prescribed by law." If this amendment was validly adopted, and if the Act of Assembly was authorized by it, there was no vacancy in the County Commissioners' office, and the names of the candidates above mentioned could not properly be placed on the official ballot. Let us then consider these two questions. The fourteenth Article of the Constitution prescribes the mode in which it may be amended. It declares that "the General Assembly may propose amendments to this Constitution; provided that each amendment shall be embraced in a separate bill, embodying the Article or section as the same will stand when amended and passed by three-fifths of all the members elected to each of the two Houses, by yeas and nays, to be entered on the Journals with the proposed amendment." We find that the Legislature by the Act of 1890, chapter 255, proposed an amendment to section first of Article seven, and that the Act was passed by three-fifths of all the members elected to each House. It was stated on the Journal of each House that "An Act to amend section one of Article seven of the Constitution of this State" was passed; and the yeas and nays are set forth, being more than three-fifths of all the members elected to each House. The requirements of the Constitution were in all respects observed, unless it is necessary, as maintained by the appellants, that the Act should be set out *verbatim* on the Journals. Each House had the bill in its possession when it passed it; and the bill was fully and clearly identified by its title. There would have been no greater certainty if every word of it had been recited. We must give a reasonable construction to the words of the Constitution. There was but one bill with this title. The entries on

the Journals of the two Houses that this bill had been passed by the yeas and nays which were stated, described their legislative action as distinctly as it could be expressed. The yeas and nays were associated as closely as possible with the enactment contained in the bill; that is to say, with the proposed amendment. It was not in the power of any person to mistake the meaning of the entry. In the amendments of the Constitution heretofore passed the same form of entry was adopted. The Act of 1874, chapter 364, proposed the amendment regulating and restricting the right of removal of causes for trial; and the Act of 1880, chapter 417, proposed the amendment respecting the election of Judges. In each case the entries on the Journals of the two Houses were in the same form as in the present instance. When, however, they were ratified by the people and proclaimed by the Governor, they were accepted by all departments of the Government as validly adopted. Under their authority, ever since their adoption, causes have been removed for trial from one Court to another; and all judicial elections have been held. We should do immeasurable evil if we should now express an opinion which should throw doubt on their validity.

The fourteenth Article of the Constitution also requires that the proposed amendment shall be submitted to the qualified voters of the State for adoption or rejection in a form to be prescribed by the General Assembly. This form was duly prescribed in the Act of 1890. It is also required, when two or more amendments are submitted to the voters, that each amendment shall be voted on separately. Several amendments were proposed by the Legislature of 1890. It is made the duty of the Governor to make publication of the bills which propose amendments. The votes cast for and against them must be returned to him, and if it shall appear to him that a majority has voted in favor of an amend-

ment, he is directed by his proclamation to declare that it has been adopted by the people, and thenceforth it becomes a part of the Constitution. Now, by his proclamation of December the third, 1891, the Governor did declare that the amendments submitted to the vote of the people had been voted on separately, and that certain of them, including the one now in question, had received a majority of the votes cast, and had been adopted by the people as parts of the Constitution. It will be seen that the Constitution confides to the Governor exclusively the power and duty of ascertaining the result of the vote from an examination of the returns made to him. And on his proclamation that a proposed amendment has received a majority of the votes cast, it becomes *eo instanti* a part of the Constitution. There is no reference of the question to any other officer, or to any other department. It is committed to the Governor without qualification or reserve, and without appeal to any other authority. Most certainly no jurisdiction is conferred on this Court to revise his decision. It may be asked what is to be done in case the Governor should violate his duty, and wrongfully proclaim an amendment as adopted which in point of fact had been rejected. It would not be becoming in this Court to suppose that such a contingency would ever happen. The courtesy due to the Executive Department forbids us to entertain such a conjecture. But if, unhappily, in future times, it ever should occur, assuredly a sufficient remedy will be found. The resources of a free government are ample, and will always be found adequate to punish and redress offences against its sovereignty. Having neither the means nor the jurisdiction to determine the result of the voting on the amendment, we disclaim all intention to investigate the question; but nevertheless, we will advert to a suggestion made on the subject. A sample ballot has been filed in the cause showing how the amendments were

voted on in Frederick County; and we shall assume, for the purposes of the argument, that the same ballot was used in all the counties which voted under the Australian system. In this ballot, under the heads of Constitutional Amendments, this amendment is described in these words: "Chapter 255 of Acts of 1890, Entitled an Act to amend section one of Article seven of the Constitution of this State. Increasing the term of office of County Commissioners. Described in the Governor's proclamation as amendment number four." It has been argued for the appellants that these words do not adequately describe the amendment. It is difficult to see how it could be designated more definitely. And it is said that the words "increasing the term of office of County Commissioners" convey an untrue account of its nature. The other words used designate with absolute certainty the amendment to be voted for, and therefore these words would not be misleading, even if not entirely accurate. The proposed amendment would confer on the Legislature the power to lengthen the terms of County Commissioners, and it could hardly be said that they could be shortened; inasmuch as they were to be elected on general ticket, and therefore their election could not occur more than once in two years; and so the existing term of two years could not be shortened. But there were nine counties not subject to the Australian law. If all the votes cast under the Australian system should be rejected, we are not informed how the counties voted which were not subject to this system. This consideration alone will shew how futile would be the attempt on the part of this Court to determine the state of the vote on this amendment.

It has been said that the terms of this amendment direct an election to be held in November, 1891; whereas it was not proclaimed until December of the same year, and could not become a part of the Constitution,

until proclamation was made. It is insisted, therefore, that something incongruous and impossible is commanded; to wit, in December it is ordered that an election shall take place on a day which is already passed. It must be admitted that the diction of this amendment might be easily improved. But we are not engaged about a question of verbal criticism. We must determine the meaning of the words employed according to the intention of the Legislature which proposed this section, and of the people who adopted it. The existing section was to be obliterated from the Constitution, and the new section was to be substituted in its place. When the amendment went into effect the new section was the only part of the Constitution which gave the Legislature the power to determine the numbers of County Commissioners, the times at which, and the periods for which, they should be elected. If the section be construed without subtlety, it is not difficult to see the practical purpose which it was intended to accomplish. Its obvious meaning is that the Commissioners elected in November, 1891, were to be subject to its provisions, in case it should be adopted. When they were elected it was not known how long they were to hold their offices; if the amendment should be rejected they would hold for two years under the existing section; but if it should be adopted, their terms would be for "such periods, not exceeding six years," as might be determined by law. The Act of 1892, chapter 283, provided that the Commissioners elected for Frederick County should hold their offices for six years from the time of their election; and that the term of those hereafter elected should be six years. This to be sure is a local law, applicable only to Frederick County; but the grant of power to the Legislature is general, and there is no requirement that the length of the terms should be uniform throughout the State, any more than that the numbers should be the same in each county.

It will be seen that we think that the amendment in question was validly adopted as a part of the Constitution, and that the Act of Assembly which we have mentioned is constitutional. A question was made whether there had been such a demand on the Supervisors and such a refusal by them as would entitle the appellants to a writ of *mandamus.* And there were other questions debated at the Bar of much interest and importance. We think it best to pass over them and rest our decision exclusively on the constitutional questions which we have been considering. They will put an end to this case, and the public interest requires that they should be settled.

*Order affirmed.*

(Decided 18th October, 1893.)